**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION**

| | |
|---|---|
| JOHN DOE, | Case No. 5:20-cv-00145-DCR |
| Plaintiff, | Judge Danny C. Reeves |
| v. | |
| TRANSYLVANIA UNIVERSITY, | **REPLY IN SUPPORT OF EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR TEMPORARY INJUNCTION** |
| Defendant. | |

The Plaintiff, John Doe ("Doe"), by and through his undersigned counsel, respectfully submits the following Reply in Support of Emergency Motion for Temporary Restraining Order and/or Temporary Injunction. At the oral argument on Doe's Motion, there were a number of issues raised by the Court. This Reply is intended to memorialize and further address those issues.

**I.   TRANSYLVANIA SHOULD BE ENJOINED FROM FOLLOWING THROUGH ON ITS STATED INTENTION TO SUBSTITUTE ALTERNATIVE DISPUTE RESOLUTION PROCEDURES FOR THOSE STATED IN ITS SEXUAL MISCONDUCT POLICY**

One of the initial issues addressed at the hearing was whether Transylvania University's (the "University") Sexual Misconduct Policy (the "Policy"), a copy of which is attached as Exhibit A, requires a live hearing. A comprehensive reading of the Policy confirms that it requires a live hearing.

   A.   *The binding Policy requires a live hearing described in terms of "physical presence"*

The Policy specifically states that "[a]ll hearings will be live…" (Ex. A at p. 13). More importantly, the Policy also provides for special accommodations, and specifically states that "[e]ither party may request to present their case outside the **physical presence** of the other party." (*Id.*) (emphasis added). Needless to say, if the Policy did not require a live hearing, with the parties

physically present, this provision would be entirely redundant and unnecessary. The Policy, read as a whole, is clear that it requires a hearing with the parties physically present. Importantly, the fact that the Policy requires a live hearing has not been disputed by the University.

> B. *The proposed regulations likewise require a "live hearing" with separate rooms available*

As to the requirement for a live hearing, those proposed regulations are remarkably similar to the provisions of the Policy itself. For example, the proposed regulations provide in pertinent part:

> For institutions of higher education, the recipient's grievance procedure *must provide for a live hearing*. *At the hearing,* the decision-maker *must permit each party to ask the other party and any witnesses all relevant questions and follow-up questions, including those challenging credibility*. Such *cross-examination at a hearing* must be conducted by the party's advisor of choice, notwithstanding the discretion of the recipient under § 106.45(b)(3)(iv) to otherwise restrict the extent to which advisors may participate in the proceedings. .... *At the request of either party, the recipient must provide for cross-examination to occur with the parties located in separate rooms with technology enabling the decision-maker and parties to simultaneously see and hear the party answering questions*. The decision-maker must explain to the party's advisor asking cross-examination questions any decision to exclude questions as not relevant. *If a party or witness does not submit to cross-examination at the hearing*, the decision-maker must not rely on any statement of that party or witness in reaching a determination regarding responsibility;

Proposed Regulations at pp 61474 & 61475 (emphasis added).[1] Just as under the Policy, a live hearing – not a virtual hearing -- is required. Under both the Policy and the proposed regulation, the only technological component is permitting the **parties themselves** to be in separate rooms with video-conferencing access to what is going on during the presentation of their respective cases, thereby eliminating any requirement that the complaining party and the responding party be in the same room at the same time. Both the Policy (written by Transylvania itself) and the proposed regulations (which Transylvania has agreed to implement) require a live hearing, with

---

[1] The proposed regulation can be accessed at https://www.federalregister.gov/documents/2018/11/29/2018-25314/nondiscrimination-on-the-basis-of-sex-in-education-programs-or-activities-receiving-federal.

2

the option for either or both of the parties to leave the room during the live hearing of their own accord; neither permits a virtual hearing via video-conferencing.

Pursuant to the proposed regulations, the hearing, including the cross-examination of the parties and witnesses, is to be "live".

In response to a written question, Transylvania's Title IX coordinator stated in a letter dated March 27, 2020: "The University is willing to modify its hearing procedures to follow the proposed Title IX regulations concerning cross-examination, provided the questions are relevant." Letter from Amber D. Morgan to Kevin Murphy, attached hereto as Exhibit B. Despite that commitment, the Virtual Hearing Alternative that Transylvania now intends to implement will not include cross-examination of the parties and witnesses at a live hearing as the proposed regulations would require.

John Doe acknowledges that, as a matter of administrative law, the regulations are "proposed regulations" that may not currently be enforceable by their terms as such. But that does not change the fact that Transylvania agreed to proceed pursuant to those regulations concerning cross-examination as if they were already in effect. The Court need not reach the issue of whether the regulations are otherwise binding as a matter of administrative law, because Transylvania agreed to implement the proposed regulations "concerning cross-examination."

C. *Transylvania intends to conduct a "virtual hearing" rather than a live hearing*

Despite the terms of its own Policy, and the provisions of the proposed regulations concerning cross-examination that the University agreed to apply, Transylvania now intends to conduct a "virtual hearing" that would not permit any in-person cross-examination of the parties or witnesses. Instead of complying with its own Policy and the proposed regulations concerning cross-examination, Transylvania has now made clear via judicial admissions in its written

3

submissions to this Court that Transylvania intends to move forward with a "virtual hearing" rather than a live hearing. *See, e.g.,* Supplemental Memorandum Regarding Method of Video Conference Hearing (Doc. #17), Exhibit A (Doc. #17-2), at PAGEID #223 ("Virtual Hearing Alternative") & at PAGEID #224 ("virtual hearing"). The so-called virtual hearing "alternative" is something that Transylvania has created[2] for use "only when an in-person hearing cannot take place due to extenuating circumstances that are beyond a party's control, or circumstances that prevent the University campus from being accessible." *Id.* at PAGEID #223. Critically, the "Virtual Hearing Alternative" submitted to the Court is explicitly an "alternative" to the "in person hearing" otherwise described in the Policy itself, and the "Virtual Hearing Alternative" implements changes to the Policy to which John Doe has not agreed. In short, Transylvania is changing the rules from those described in the Policy while John Doe's case is ongoing.

> D. This Court can and should enjoin Transylvania from violating its Policy and implementing its newly-created "alternative" to the Policy's procedures

The Policy is a form of private dispute resolution procedure. Kentucky has recognized that when private parties are bound by a dispute resolution procedure, a court can and should enjoin a party from pursuing an alternative dispute resolution approach of that party's choosing without the other party's consent. *See, e.g., North Fork Collieries, LLC v. Hall,* 322 S.W.3d 98 (Ky. 2010).[3] Transylvania should be prohibited from its stated intention to pursue an "Virtual Hearing

---

[2] The footer at the bottom of each page of the "Virtual Hearing Alternative" shows a date of April 2020, so the recent creation of that procedure is not in doubt. Indeed, Transylvania informs the Court that the "hearing protocol is not yet final," that it is "subject to improvement," and that the "final protocol will be provided to all parties prior to the hearing." DOC #17, PAGEID #205. This generates yet another level of unfairness to John Doe, because just days before the implementation of the "Virtual Hearing Alternative" it is still a moving target.

[3] The *North Fork Collieries* case was decided in the context of a choice between arbitration (to which the parties had agreed) and litigation (to which the parties had not agreed). Nevertheless, the principle is the same: when a party has a right to a procedural mechanism for resolving the dispute, injunctive relief is necessary, because the right to that procedure will be destroyed by the alternate proceeding and that right cannot be vindicated by an ordinary appeal at the conclusion.

Alternative" to which John Doe has not consented.

## II. FAIRNESS IN THE CONTEXT OF A PRIVATE UNIVERSITY TITLE IX PROCEDURE REQUIRES, AT THE VERY LEAST, GRANTING JOHN DOE THE PROCESS TO WHICH HE IS DUE UNDER THE UNIVERSITY'S OWN POLICY

Another issue discussed at the hearing was due process and the implications of the University's status as a private institution.

### A. *Transylvania's Policy establishes processes to which John Doe is due*

As a private institution, if Transylvania had never established any processes for handling Title IX issues, federal law would be inherently implicated. John Doe would have no procedures promulgated by the university itself to invoke. But here, Transylvania did establish procedures, including a provision for a live hearing and a process that is "fair". Those procedures define the process to which John Doe is entitled or "due" in the circumstances presented here.

Courts in other jurisdictions have recognized the phenomenon that "due process" may (or may not) apply to a private university unless it is somehow found to be a state actor. But observing the existence of that distinction does not mean that the private university is free to do whatever it may please. The private university is bound by its own policies as well as by an obligation to provide a process that is fair.[4] Therefore, even if it is determined that constitutional "due process" is inapplicable to the conduct of a private entity in a given circumstance, due process jurisprudence is instructive in considering fair hearing standards for student disciplinary proceedings at private

---

[4] The Court in *Doe v. Allee* observed early in 2019: "Until recently, few cases had attempted to define 'fair hearing standards for student discipline at private universities.' … For practical purposes, common law requirements for a fair disciplinary hearing at a private university mirror the due process protections at public universities." 30 Cal. App. 5th at 1059 (internal citations omitted). *See also Doe v. Trustees of the University of Penn.*, 270 F.Supp.3d 799, 813 (E.D. Pa. 2017) (student at private university was not entitled to the same due process protections as student at a state university, but due process protections applied in contract action in which private university agreed to provide a "fundamentally fair" disciplinary process).

5

schools.  The principle of fairness (applicable to private universities) and due process principles (directly applicable to public universities) should generally yield the same result, especially when it comes to compliance with their respective written Title IX policies.

> B.  *Although the Court need not reach questions of constitutional due process (given the terms of Transylvania's own Policy), constitutional due process may apply in <u>the context of a private university's implementation of Title IX</u>*

When evaluating Doe's Verified Complaint, it is also important to keep in mind the underlying reasons why the University created and implemented the Policy in the first place.  The simple answer:  the University is required to do so by federal law.  34 C.F.R. §106.8(b) states as follows: "A recipient shall adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by this part."  Thus, this is not a purely private policy created for purely private reasons.  Rather, the Policy was implemented as mandated by federal law.

That brings us to a substantially related issue: constitutional due process.  The purpose of the Policy and the federal requirements to implement such Title IX policies is to provide due process protections for students accused of significant allegations such as sexual misconduct.  In the proposed regulations, the United States Secretary of Education, Betsy DeVos, makes that abundantly clear.  Specifically, the proposed regulations state the following: "The proposed regulations are intended to promote the purpose of Title IX by requiring recipients to address sexual harassment, assisting and protecting victims of sexual harassment and **ensuring that due process protections are in place for individuals accused of sexual harassment.**"  (emphasis added).  Indeed, the term "due process" appears 34 times in the text of the proposed regulations.

As discussed above, Doe is cognizant of the fact the regulations are, at this stage, proposals that have not yet been formally adopted at this time.  But that does not change the nature of the

procedural rights of John Doe to the extent that the University has *otherwise* committed to provide them. Transylvania indicated that it would follow the proposed Title IX regulations concerning cross-examination, which was in practical effect a commitment to provide John Doe with at least a portion of the "due process" that the proposed regulations describe, even though those regulations as a whole have not yet been formally adopted. Transylvania must therefore comply with the aspects of the proposed Title IX regulations "concerning cross-examination" – requirements that are intended to ensure "that due process protections are in place for individuals accused of sexual harassment." Pursuant to Transylvania's commitment to follow them, the proposed regulations applicable to cross-examination impose "due process protections" that might not otherwise apply to a private university such as Transylvania *constitutionally*. In short, by its commitment to follow the proposed regulations concerning cross-examination, Transylvania must afford the accused the same "due process" protections concerning cross-examination that a state actor must inherently apply.

Several "due process" rights are implicated by Transylvania's violation of its own Policy, but the right to cross-examine one's accuser and the other witnesses at a live hearing is key. Although Transylvania has indicated that it will permit cross-examination, its intention to proceed with the Virtual Hearing Alternative renders that concession largely illusory. None of the parties or the witnesses will be physically present, so a conventional cross-examination at a live hearing will not occur. The practical ability of examining counsel to direct the attention of the parties and witnesses to particular parts of photographs, videos or other exhibits will be limited, with the very likely effect of impairing the effectiveness and clarity of the examination.

All of the foregoing increases the significance of any ruling the Court may make in this case, especially if the Court does not simply address the situation by ordering Transylvania to

comply with all of the terms of its own Policy and the aspects of the proposed regulations that it has agreed to follow. Transylvania seeks to ignore its Policy regarding a live hearing and other procedural safeguards arising from the physical presence of the parties and witnesses, and to limit the practical effect of its commitment to allow cross-examination. Does a university's status as a private institution provide it with a license to ignore its own Title IX policies and to ignore its obligations under federal law to provide due process in sexual misconduct investigations/hearings, despite the fact that the university is subject to Title IX and reaps the benefit of federal funds? Candidly, the answer has to be no.

### III. DOE'S CLAIMS ARISE FROM TRANSYLVANIA'S VIOLATIONS OF FEDERAL LAW AS WELL AS ITS VIOLATIONS OF ITS OWN POLICY

Another issue that was raised at the hearing was the precise nature of Doe's claims. Those claims are relatively straightforward.

First, Doe's first cause of action asserts a violation of Title IX as a result of the University's discrimination against Doe based on his sex, which Title IX expressly prohibits. *See* 20 U.S.C. §1681, *et seq.* Doe's claim is predicated in part on the significant discrepancies that are present in the treatment of a claim by a female student, versus a claim by a male student. When it came to a complaint by a female student, Doe, the male student, was immediately evicted from his dorm. Yet no such measures were implemented against a female student based on a complaint from a male student. Additionally, complaints by female students are investigated much differently. In this case, the complaint by Doe's accuser was investigated for approximately two months. However, when it came to Doe's complaint, it was investigated for a mere two weeks, and summarily dismissed without interviewing a single witness. That is discrimination on the basis of the sex of and has resulted in the deprivation of Doe's access to educational opportunities and benefits.

Doe's second claim is based on the University's failure to comply with its Policy, resulting in the violations of Doe's right to the procedural protections of that Policy and further manifestation of the University's pro-female, anti-male bias. The violations of Transylvania's Policy have been discussed in more detail above. As to the gender bias aspects of the case, a similar situation was presented in *Doe v. Columbia Univ.*, 831 F.3d 46 (2nd Cir. 2016). In that case, the plaintiff raised a number of issues regarding the investigation process, including the university's failure to reconcile conflicting information that was presented by the accuser during the investigation. *Id.* at 49-50. That is analogous to one aspect of Doe's complaints in this matter because the University failed even to ask Doe's accuser about objective evidence that directly contradicts her story. In the *Columbia* case, there were also issues raised regarding the university's policy on sexual assault and the failure to follow some of the provisions of that policy. *Id.* at 51-52. Again, the same is true here (as more fully discussed above). The Second Circuit in *Columbia* ultimately reversed the trial's entry on the defendant's motion to dismiss and concluded that the plaintiff had pled sufficient facts to proceed with his Title IX claim.

### IV.    OTHER ACCUSATIONS AGAINST DOE HAVE NO BEARING ON HIS RIGHT TO THE PROCEDURAL PROTECTIONS AT ISSUE HERE

Another issue that was raised by the Court toward the end of the hearing was an accusation regarding a second complaint against Doe. The substance of that accusation is entirely irrelevant to this proceeding, but to the extent the Court has concerns that it is relevant, Doe points out the following.

First, the issues presented by the instant motion do not run to the underlying merits of the allegations or defenses about the conduct of John Doe and Jane Doe on the night in question. The issues raised here are about the processes that have been implemented by Transylvania – and

further processes that will be unquestionably[5] be implemented by Transylvania unless it is enjoined from violating its own Policy and Title IX.  The merits of whatever other allegations may have been made against Doe have no direct impact on the procedural rights of Doe as to the charges that are actually at issue in the context of the current motion.  Indeed, even the merits of the underlying charges to be considered at the "virtual hearing" that the university has scheduled have no bearing on the motion that is currently before the Court.  This Court is not being asked to consider the likelihood that Doe will prevail on the merits in that hearing:  Doe is entitled to the procedural protections of the Policy and Title IX whether he engaged in the charged conduct or not (although Doe hastens to add that, when the truth comes out, the evidence will show that the charges are actually baseless).  Any likelihood of success on the "merits" in the current context relates to establishing that Transylvania will violate its own Policy and Title IX absent injunctive relief – something that is effectively established by Transylvania's stated intention to forego protections for the accused (such as a live hearing in which the Title IX participants are in the "physical presence" of each other) and to implement "alternative" procedures not contained in its Policy or Title IX (such as its newly invented "Virtual Hearing Alternative").

Second, if the Court nevertheless chooses to explore the merits of the other charge, the evidence will show that accusation was made by the Doe's accuser's friend.  Notably, it was made two months after the alleged incident, around the same time Doe's current accuser levied her accusations.  Also notably, the University never informed Doe what the accusation was against him, other than to say there was an "incident" sometime during the month of October.  Doe did not find out what the accusations actually were until the University dismissed the female student's

---

[5] This is not a situation in which there is any real doubt about the overall course of conduct that Transylvania intends to pursue.  As discussed above, Transylvania has explicitly informed the Court that – unless enjoined from doing so – the university will implement the Virtual Hearing Alternative (an alternative to its existing Policy) as disclosed in its submissions to the Court.

complaint.

To the extent the Court believes the second accusation is relevant for purposes of the University's determination to evict Doe from his dorm without notice or an opportunity to be heard, how Transylvania dealt with that accusation shows why procedural protections for the accused are of the utmost importance. Simply put, Doe was evicted based on an allegation that the University ultimately determined was unfounded. The University never should have evicted Doe based on mere allegations and one-sided stories from a female student, let alone based on allegation that was unfounded. That is why the accused has procedural protections under the Policy and Title IX itself—to avoid that precise type of scenario.

Although not necessarily pertinent to the resolutions of the issues currently before the Court, another issue raised at the hearing was Doe's failure to appeal the University's decision that there was insufficient evidence to proceed with Doe's claim and to present it to a hearing panel. The answer to that question is simple: the University's Policy does not allow a party to appeal the determination that there is insufficient information to proceed with a claim. The University's Policy states, in pertinent part: "If however, the investigation concludes that sufficient evidence does not exist, **the matter will be closed without further proceedings under this policy**." (Ex. A, p. 11) (emphasis added). The section in the Policy regarding appeals only applies to appeals of a hearing panel's decision, not a determination on the front-end that insufficient evidence exists to present the claim to a hearing panel. (*Id.* at p. 15).

Another issue raised at the hearing, and in the University's Response brief, is that the Court should refrain from deciding any of the issues in this case until the sexual misconduct hearing takes place.[6] The most obvious problem with that assertion is the fact that the University plans to

---

[6] For the record, the Court correctly rejected the University's argument regarding abstention under the *Younger* doctrine, and therefore that issue will not be addressed any further in this Reply.

11

proceed (and has now judicially admitted to the Court that it will proceed) with a hearing process that is a violation of its own pre-existing Policy.  The University's refusal to provide Doe with a live hearing of the type described in its Policy is not in question, so there is no reason to wait and see whether Transylvania will actually violate its Policy or Title IX.  ***Transylvania has explicitly said what it intends to do.***   That alone makes the facts of this case remarkably different from other cases where there is no way to establish in advance that the institution is going to proceed in violation of a student's due process rights and the university's policy.

## V.    CONCLUSION

The University's failure to provide John Doe with the processes to which he is due pursuant to its own Policy is significant, and Transylvania should not be permitted to proceed with a "Virtual Hearing Alternative" and other violations of its Policy or Title IX in the context of the ***admitted*** facts at issue here.  Doe is in the precarious position of being forced to proceed into the scheduled "virtual" hearing without the protections or rights that the University promises its students (pursuant to the requirements of federal law).  The reality of the harm that John Doe will suffer is effectively certain, because Transylvania has explicitly acknowledged that it will fail to provide to John Doe unless its conduct is enjoined by an order of this Court.  Given the importance of the procedural protections that the University has failed to provide to Doe, and most importantly the acknowledged intention of Transylvania to deprive Doe of the pre-existing procedural protections of its Policy and Title IX by implementing a "Virtual Hearing Alternative" on April 15, the Court

should prohibit the University from proceeding with the currently scheduled hearing.

                                                Respectfully submitted,

                                                */s/ Kevin L. Murphy*
                                                Kevin L. Murphy (KBA #50646)
                                                MURPHY LANDEN JONES PLLC
                                                2400 Chamber Center Drive, Suite 200
                                                P.O. Box 17534
                                                Fort Mitchell, KY  41017-0534
                                                Telephone: (859) 578-3060
                                                Fax: (859) 578-3061
                                                KMurphy@MLJfirm.com
                                                *Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

      I hereby certify that on this 10th day of April, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all parties of record.

                                            */s/ Kevin L. Murphy*
                                            Kevin L. Murphy